UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------ X
                            :

LIVEINTENT, INC.,                     :
                            :

           Plaintiff/Counter-Defendant,   :
                            :

                 v.                    :
                            :

MARK NAPLES and WIT STRATEGY,    :
                            :

          Defendants/Counterclaimants.   :
                            :

------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 23, 2018

16 Civ. 9732 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

      In March 2010, Plaintiff LiveIntent, Inc. ("LiveIntent") contracted with Defendants Mark Naples and his company, WIT Strategy (collectively, "Defendants"), for Defendants to provide services to LiveIntent over a six-month period. According to Defendants, after six weeks of performance, LiveIntent determined that it could no longer afford Defendants' services, resulting in a modification to the parties' agreement by which LiveIntent agreed to pay Defendants cash for the first month of services and to provide equity shares in LiveIntent as compensation for "ongoing" services from Defendants. Defendants allege that they continued to provide services to LiveIntent, but discovered, more than six years after the contract modification, that LiveIntent had never issued them any stock.

      After advising Naples of its belief that it owed no equity shares, LiveIntent brought this action, seeking a declaratory judgment to the same effect. Defendants then brought counterclaims against LiveIntent for breach of

contract, fraud, and declaratory judgment.  Before the Court are LiveIntent's motions to dismiss Defendants' counterclaims and for judgment on the pleadings.  For the reasons that follow, the Court grants the motions.

**BACKGROUND**[1]

**A.    Factual History**

**1.    The Initial Contract**

Through his company, WIT Strategy, Naples provides "strategic public relations services [to] startup companies," including avenues for publicity "that would otherwise not be available to a startup company."  (Countercl. ¶ 1).  LiveIntent is in the business of providing "[email-]based marketing solutions" and was a startup company in March 2010.  (*Id.* at ¶¶ 2-3).  In or around that time, Naples began discussions with LiveIntent's Chief Executive Officer, Matt Keiser, and its Chief Operating Officer, Dave Hendricks, regarding WIT Strategy contracting to provide services for LiveIntent.  (*Id.* at ¶ 3).

These discussions resulted in the parties executing a contract on March 10, 2010, under which WIT Strategy would coordinate "an initial public relations campaign" to "launch" LiveIntent over the course of a six-month period from March 15, 2010, through September 15, 2010; WIT Strategy would

---

[1]    The facts in this section are assumed to be true for purposes of this motion and are drawn from Defendants' Counterclaims contained in the Second Amended Answer ("Countercl." (Dkt. #26)), and from the exhibits attached thereto, including the purported Letter of Agreement between the parties ("Letter of Agreement" (Dkt. #26-1)), and various emails, which are referred to by sender and date of transmission ("[Surname] [Date] Email") (Dkt. #26-1).  For convenience, the Court refers to LiveIntent's Complaint as "Compl." (Dkt. #1), the memorandum of law in support of LiveIntent's motions as "Pl. Br." (Dkt. #27), and Defendants' memorandum of law in opposition to the motions as "Def. Opp." (Dkt. #30).

then provide "ongoing" public relations services "after the anticipated expiration date of the [c]ontract." (Countercl. ¶¶ 3-6; *see* Letter of Agreement). In exchange, LiveIntent would pay WIT Strategy $2,500 per month over the six-month period, in addition to conveying to Naples equity shares in LiveIntent equivalent to $5,000 (in present-day value) each month during the six-month period. (*Id.* at ¶ 5). LiveIntent had the option to terminate the contract after three months' service, provided that LiveIntent gave WIT Strategy one month's notice of termination. (*Id.* at ¶ 7).

### 2. The Alleged Modification of the Contract

As Defendants recall, for the first six weeks of the six-month period, WIT Strategy performed under the contract, but LiveIntent then "determined that it was not prepared to sustain a six-month launch" because it could not afford WIT Strategy's services. (Countercl. ¶ 8). Due to LiveIntent's low cash flow, in April 2010, the parties modified the contract to provide that LiveIntent would pay WIT Strategy $2,500 in cash and the remaining two months' fees ($5,000) in equity shares in the company, in addition to the equity interests to which Naples was previously entitled. (*See id.* at ¶¶ 8, 11). Hendricks and Naples agreed further "that Hendricks would contact Naples in the future ... to provide the services that [WIT Strategy] would typically provide ... following [an] initial launch, i.e., the 'ongoing basis' services specified in the [c]ontract." (*Id.* at ¶ 9).

LiveIntent thereafter paid WIT Strategy $2,500 in cash and provided Naples an Internal Revenue Service Form 1099 in relation to that payment.

(Countercl. ¶ 12).  LiveIntent did not, however, provide any corresponding documentation regarding a transfer of stock to WIT Strategy or Naples.

### 3.    Defendants Continue to Provide Services to LiveIntent

Despite receiving no record of any stock transfer, Naples remained in contact with Keiser and Hendricks, and, indeed, continued to provide services for LiveIntent.  (*See* Countercl. ¶ 13).  Naples contends that he did so, without additional compensation, because he "believed that he was a [LiveIntent] shareholder," and "that by performing these services[,] he would increase the [company's] value."  (*Id.* at ¶ 18).  The Counterclaim describes several instances of such services and provides email correspondences between Naples and Hendricks suggesting that the parties had an ongoing business relationship.[2]

For example, on November 22, 2011, Hendricks emailed Naples requesting "assistance in gaining entrance to an industry media summit." (Countercl. ¶ 14; *see also* Hendricks Nov. 22, 2011 Email).  Nearly four months later, on March 16, 2012, Hendricks emailed Naples, thanking him for an introduction to another individual that resulted in the release of an article in a trade publication that featured an interview with Hendricks.  (Countercl. ¶ 15; *see also* Hendricks Mar. 16, 2012 Email; Naples Mar. 20, 2012 Email).  And on March 19, 2012, Hendricks emailed Naples commending WIT Strategy's efforts in organizing a panel presentation for LiveIntent.  (Countercl. ¶ 16; *see also* Hendricks Mar. 19, 2012 Email).  The Counterclaim also alleges that Keiser

---

[2]    As discussed more fully below, the Court may consider these attachments to Defendants' pleading.

4

made at least one statement suggesting that Naples held shares in LiveIntent:

In 2011, after Keiser hired Naples's nephew as an intern, Keiser complimented

the intern's work, telling Naples, "as a shareholder, [Naples] should be proud."

(Countercl. ¶ 19).

### 4. Naples Discovers That He Holds No Equity Interest in LiveIntent

It was not until September 21, 2016, that Naples requested a copy of a

stock certificate from LiveIntent's CEO Keiser. (Countercl. ¶ 21). Naples

explained that he was required to disclose certain corporate interests in light of

his then-current work for a client that also did business with the United States

government. (*See id.*; Naples Sept. 21, 2016 Email). Rather than responding

to Naples, Keiser forwarded the email to Hendricks, who responded a day later,

stating, "[a]ccording to [LiveIntent's] records, [Naples was] not 'granted' any

options outright, and none were ever exercised or purchased." (Hendricks

Sept. 22, 2016 Email; *see* Countercl. ¶¶ 22-23)).

Instead, Hendricks stated that any equity interest Naples had would have

been subject to "a Company Advisor plan with a 1-year cliff and 2-year vesting

(if [Naples was] still offering services to the company)," but that LiveIntent and

WIT Strategy had "terminated [their] advisor relationship before the options hit

their 1-year vesting cliff, so they were automatically canceled." (Hendricks

Sept. 22, 2016 Email). Naples contends that he had no knowledge of any such

Company Advisor plan and was not provided a copy of it even after requesting

one. (Countercl. ¶ 24). In October 2016, Naples retrieved a copy of the

purported contract between WIT Strategy and LiveIntent from his files and

forwarded the scanned document to Hendricks and Gary Deutsch, LiveIntent's

Chief Financial Officer. (*See id.* at ¶¶ 23, 25; Letter of Agreement).[3]  But

Deutsch repeated what Hendricks had conveyed, "insist[ing] that the terms of

[Naples's] service were governed by an employee compensation agreement that

Naples, an independent contractor, had never seen." (Countercl. ¶ 26).

## B.    Procedural History

LiveIntent filed its Complaint on December 16, 2016. (Dkt. #1).  It

contained a single cause of action, requesting declaratory judgment that

(i) "[t]he statute of limitations has expired on any claim that WIT Strategy or

[Naples] could assert for compensation for services provided to LiveIntent";

(ii) "[t]he purported 'letter agreement' recently supplied by Mr. Naples to

support his claim is not an authentic, genuine, and enforceable contract"; and

(iii) "LiveIntent owes no equity or other compensation to WIT Strategy or

[Naples]." (Compl. ¶ 25).

After receiving an extension of time to answer or otherwise respond to the

complaint, Defendants answered the Complaint on January 27, 2017, generally

denying LiveIntent's allegations. (*See* Dkt. #9, 11).  On February 16, 2017,

Defendants amended their Answer to include counterclaims against LiveIntent

for breach of contract, fraud, and declaratory judgment. (Dkt. #14).  On

April 28, 2017, Defendants amended their Answer once more, maintaining

their counterclaims against LiveIntent. (*See* Dkt. #26).

---

[3]      LiveIntent's Complaint alleges that "[t]he 'letter agreement' supplied by [Naples] to
support his claim is a forgery and a recent fabrication invented to trick and deceive
LiveIntent into believing that he had support for his claim." (Compl. ¶ 15).

On May 26, 2017, LiveIntent filed the instant motion to dismiss Defendants' counterclaims under Federal Rule of Civil Procedure 12(b)(6) and for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). (Dkt. #27-28). On June 28, 2017, Defendants opposed the motion (Dkt. #30), and on July 14, 2017, LiveIntent replied to the opposition (Dkt. #31).

## DISCUSSION

### A. Legal Standards

#### 1. Motions to Dismiss a Counterclaim and Motions for Judgment on the Pleadings

A motion to dismiss a counterclaim and a motion for judgment on the pleadings are both subject to the same standard as a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6). *See Lokai Holdings LLC* v. *Twin Tiger USA LLC*, No. 15 Civ. 9363 (ALC), 2018 WL 739435, at *2 (S.D.N.Y. Feb. 6, 2018) (quoting *Orientview Techs. LLC* v. *Seven for All Mankind, LLC,* No. 13 Civ. 0538 (PAE), 2013 WL 4016302, at *2 (S.D.N.Y. Aug. 7, 2013)); *Neeseman* v. *Mt. Sinai W.*, No. 17 Civ. 1766 (LGS), 2018 WL 626358, at *3 (S.D.N.Y. Jan. 30, 2018) (citing *Bank of N.Y.* v. *First Millennium, Inc.*, 607 F.3d 905, 922 (2d Cir. 2010)).

Rule 12(b)(6) requires a court to "draw all reasonable inferences in [the non-moving party's] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)). Thus, "[t]o survive a motion to dismiss, a [pleading] must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).

"While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [a non-moving party's] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (per curiam) (quoting *Twombly*, 550 U.S. at 570). "Where a [pleading alleges] facts that are 'merely consistent with' [the moving party's] liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Moreover, "the tenet that a court must accept as true all of the allegations contained in a [pleading] is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

## 2. Documents the Court May Consider

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the [pleading], documents attached to the [pleading] as exhibits, and documents incorporated by reference in the [pleading]." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the [pleading] 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l*

*Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (per curiam)). But "even if a document is 'integral' to the [pleading], it must be clear on the record that no dispute exists regarding the authenticity[, relevance,] or accuracy of the document." *DiFolco*, 622 F.3d at 111 (quoting *Faulkner* v. *Beer*, 463 F.3d 130, 134 (2d Cir. 2006)).

The standard applicable to documents a court may consider in ruling on a motion for judgment on the pleadings under Rule 12(c) is slightly broader, allowing consideration not only of the nonmoving party's pleading, but also that of the moving party. "On a 12(c) motion, the court considers 'the complaint, the answer, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case.'" *L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Roberts* v. *Babkiewicz,* 582 F.3d 418, 419 (2d Cir. 2009)). "A [pleading] is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Id.* (quoting *Sira* v. *Morton*, 380 F.3d 57, 67 (2d Cir. 2004)).

Here, any difference between the two standards is immaterial to the Court's resolution of LiveIntent's motions because the only document attached to the Complaint — the Letter of Agreement — is also attached to Defendants' responsive pleading. (*Compare* Compl. Ex. A., *with* Countercl. Ex. A). And although LiveIntent challenges the authenticity of the Letter of Agreement on the basis of forgery, because LiveIntent's motions do not depend on the validity

of the document and both parties have attached it to their pleadings, the Court may consider the document solely for the purpose of substantiating the uncontested fact that Naples provided this document in October 2016 to Hendricks and Deutsche. *Cf. UPS Store, Inc.* v. *Hagan*, 99 F. Supp. 3d 426, 434-35 (S.D.N.Y. 2015) (refusing to consider agreement where opposing party *did not* attach it to pleading and challenged its authenticity as a forgery). The Court may also consider the emails attached to Defendants' pleading as LiveIntent has raised no dispute as to their authenticity or relevance. *See DiFolco*, 622 F.3d at 111.

### 3.    Choice of Law

A federal court sitting in diversity applies the choice-of-law rules of the state in which it sits. *See In re Gawker Media LLC*, 571 B.R. 612, 626 (Bankr. S.D.N.Y. 2017) (quoting *Liberty Synergistics Inc.* v. *Microflo Ltd.*, 718 F.3d 138, 151 (2d Cir. 2013)). The Court shall apply New York law because both sides rely on it in their briefing and neither side disputes its applicability. *See Celle* v. *Filipino Reporter Enters. Inc.*, 209 F.3d 163, 175 (2d Cir. 2000) ("Since no party has challenged the choice of New York [] law, all are deemed to have consented to its application." (citations omitted)); *Hagan*, 99 F. Supp. 3d at 437 n.8 ("Both parties rely on New York law … and this Court will do the same." (citing *Fed. Ins. Co.* v. *Am. Home Assurance Co.,* 639 F.3d 557, 566 (2d Cir. 2011)).

**B.      Defendants' Counterclaims Are Untimely**

As alleged by Defendants, the relevant timeline is as follows:  The parties entered an initial contract on March 10, 2010, and modified that contract in April 2010.  After continuing to provide services to LiveIntent through at least March 2012, Naples requested a stock certificate on September 21, 2016. LiveIntent then filed this action on December 16, 2016; Defendants answered the Complaint on January 27, 2017, and then amended their answer to include counterclaims on February 16, 2017.

To determine whether a counterclaim was timely filed, a court applying New York law considers the counterclaim "interposed when a pleading containing it is served."  N.Y. C.P.L.R. § 203(d).  Thus, the question here is whether Defendants' counterclaims were untimely as of February 16, 2017, when Defendants amended their answer to include them.  Because the relevant dates appear on the face of Defendants' pleading, the Court may rule as a matter of law on LiveIntent's motion to dismiss on statute-of-limitations grounds.  *See Ghartey* v. *St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a [pleading] show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss.").

LiveIntent contends that Defendants' counterclaims for breach of contract and fraud are untimely under New York law.  *First*, LiveIntent argues that Defendants' contract claim accrued in April 2010, when the parties modified the March 2010 contract but did not exchange any LiveIntent stock,

and that New York's six-year statute of limitations for contract claims thus required bringing this claim by April 2016. (Pl. Br. 6). *Second*, LiveIntent argues that Defendants' fraud claim also accrued in April 2010, when Defendants received no stock from LiveIntent, thus rendering the fraud claim untimely under New York's six-year statute of limitations. (Pl. Br. 12). The Court considers these arguments in turn, and agrees with LiveIntent.[4]

### 1. Breach of Contract

As mentioned above, New York imposes a six-year statute of limitations on breach-of-contract claims, and the limitations period commences when the claim accrues, which is "ordinarily … upon breach." *Guilbert* v. *Gardner*, 480 F.3d 140, 149 (2d Cir. 2007) (citing N.Y. C.P.L.R. §§ 231(2), 203(a)). Significantly, "[t]he plaintiff need not be aware of the breach or wrong to start the period running." *Id.* "Where a contract does not specify a date or time for performance, New York law implies a reasonable time period." *Id.* Conversely, if "a contract requires continuing performance over a period of time, each successive breach may begin the statute of limitations running anew." *Faulkner* v. *Arista Records LLC*, 602 F. Supp. 2d 470, 478 (S.D.N.Y. 2009).

Taking at face value Defendants' allegations, Naples was to become a LiveIntent shareholder immediately after the parties modified their contract in

---

[4] New York law provides that a "counterclaim is not barred [as untimely] if it was not barred at the time the claims asserted in the complaint were interposed[.]" N.Y. C.P.L.R. § 203(d). This provision is inapplicable to assessing LiveIntent's motions, however, because LiveIntent filed its Complaint in December 2016 and contends that both of these claims should have been filed approximately eight months earlier, by April 2016.

April 2010.[5] Thus, by failing to transfer stock to Naples or WIT Strategy, LiveIntent breached the contract at that time. *See Edlux Constr. Corp.* v. *State of New York*, 300 N.Y.S. 509, 511-12 (3d Dep't 1937) ("A cause of action accrues and the statute of limitations begins to run when a contract is breached, or when one omits the performance of an obligation, although damages may not accrue until a later date." (internal citations omitted)), *aff'd*, 277 N.Y. 635 (1938). Defendants were thus required to file their contract claim against LiveIntent by April 2016, and, as detailed below, Defendants' arguments to the contrary only support this position.

Defendants contend that LiveIntent had a continuing obligation under the contract "to provide consideration for [Defendants'] services" and that LiveIntent breached this obligation whenever it "failed to issue stock to Naples[ and] failed to maintain him in its equity structure." (Def. Opp. 7).[6] But in the same breath, Defendants argue that Naples only continued to perform services for LiveIntent after April 2010 for "consideration," which "in Naples'[s] mind[ was] the increased value of his [LiveIntent] stock." (Def. Opp. 6-7). For Naples to have enjoyed such increased value, he would have had to have been a LiveIntent shareholder at the time he provided those services, *i.e.*, when the parties modified their contract in April 2010. In other words, Defendants'

---

[5]    *See, e.g.*, Countercl. ¶ 11 ("Naples and Hendricks agreed that Plaintiff would pay WIT [Strategy] $2500 — one month's fee — in cash. The remaining two month[s'] fees, or $5000, would be added to the three months ($15,000) of equity considerations due to Naples under the Contract.").

[6]    Defendants expressly disclaim any argument that the Court should equitably toll the statute of limitations to render their counterclaims timely. (*See* Def. Opp. 6 n.1)

alleged contract must have required LiveIntent to convey stock to Naples immediately upon its modification, such that the company's failure to do so constituted a breach of the alleged contract between the parties in April 2010.

Defendants rely on *Guilbert* v. *Gardner*, 480 F.3d 140 (2d Cir. 2007), for the proposition that LiveIntent breached the contract every time Defendants performed services for LiveIntent without holding "continuing equity in" the company. (Def. Opp. 7). In *Guilbert*, the Second Circuit deemed a contract claim timely where it alleged that the defendants had failed to make annual contributions to the plaintiff's pension plan within six years of the action's commencement. 480 F.3d at 150. Contrariwise, LiveIntent failed to make a single conveyance of stock to Defendants more than six years prior to the date on which Defendants filed their counterclaims. Indeed, Defendants' pleading contains no allegation that the contract required LiveIntent to convey stock to Defendants on an ongoing basis, but merely that it "failed to maintain [Naples] in [LiveIntent's] equity structure." (Def. Opp. 7).

Defendants' reliance on *Kermanshah* v. *Kermanshah*, 580 F. Supp. 2d 247 (S.D.N.Y. 2008), is similarly misplaced. (*See* Def. Opp. 5-6). There, the parties entered into a contract by which they "agreed to equally share 'all expenses, costs, revenue, income, and losses generated'" by their joint venture, and the plaintiff alleged a breach of this agreement when the defendants disallowed him from "shar[ing] equally in the businesses" formed under the contract. 580 F. Supp. 2d at 253, 261. The defendants there also made "sham payments" to the plaintiff that the defendants misrepresented as an even share

of the profits. *Id.* at 261. The court held this claim timely because the defendants' "obligation to share equally in 'corporate opportunities, investments, and businesses' was a continuing contractual obligation that presumably existed throughout the life of the various entities." *Id.* Here, however, the contract did not entitle Defendants to an ongoing distribution of profits; it instead entitled them to a single distribution of cash and equity. Assuming that LiveIntent's failure to make such a distribution was indeed a breach of this contract, Defendants' counterclaims contain no allegations showing further breaches within the six-year period preceding their filing. For all of these reasons, Defendants' breach-of-contract claim is untimely and must be dismissed.

### 2. Fraud

Under New York law, the statute of limitations applicable to a fraud claim is the later of either (i) six years from the date that the claim accrued or (ii) two years from the time the fraud was discovered or could have been discovered with "reasonable diligence." N.Y. C.P.L.R. § 213(8). The party alleging fraud "bears the burden of establishing that the fraud could not have been discovered before the two-year period prior to the commencement of the action." *Guilbert*, 480 F.3d at 147. "Generally," for the limitations period to begin running, "knowledge of the fraudulent act is required and mere suspicion will not constitute a sufficient substitute." *Sargiss* v. *Magarelli*, 12 N.Y.3d 527, 532 (2009) (quoting *Erbe* v. *Lincoln Rochester Tr. Co.*, 3 N.Y.2d 321, 326 (1957)). And "[w]here it does not conclusively appear that a plaintiff had knowledge of

facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of facts." *Id.* (quoting *Trepuk* v. *Frank*, 44 N.Y.2d 723, 725 (1978)).

"New York law recognizes," however, "that a plaintiff may be put on inquiry notice, which can trigger the running of the statute of limitations if the plaintiff does not pursue a reasonable investigation." *Koch* v. *Christie's Int'l PLC*, 699 F.3d 141, 155 (2d Cir. 2012) (citing *Gutkin* v. *Siegal*, 926 N.Y.S.2d 485, 486 (1st Dep't 2011)). The standard applicable to such inquiry notice is as follows:

> [W]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him.

*Id.* (quoting *Armstrong* v. *McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)).

The facts underlying Defendants' counterclaims show that Naples was on inquiry notice soon after the contract modification in April 2010. Given the size of the stock transaction as Naples understood it, consisting of a total of $20,000 worth of LiveIntent equity, a person of ordinary intelligence would have been aware of a probability that something was amiss. *Cf. Guilbert*, 480 F.3d at 147-8 (holding plaintiff was on inquiry notice that defendant misrepresented contributing to pension plan when plaintiff had no documentation of pension plan and requests for documentary evidence of plan were unsuccessful). Naples therefore was under a duty to investigate any

potential fraud at that time, but he failed to do so until over six years later, when he requested a stock certificate from LiveIntent. *See Koch*, 699 F.3d at 155.

In response, Defendants allege that Keiser referred to Naples "as a shareholder," ostensibly in an effort to lull Naples into believing he held such status. (Countercl. ¶ 19). But this statement was made in 2011, and Defendants do not allege that LiveIntent provided Naples any sort of further assurances (much less documentation) in the remaining years leading up to or during the two years preceding the filing of Defendants' counterclaims. Indeed, according to Defendants, the last interaction between LiveIntent and Naples prior to Naples's stock-certificate request was in March 2012. Naples's professed belief that he held a rather large stake in the startup company makes plain that he should have inquired into his shareholder status far sooner than September 2016.

Defendants were on inquiry notice of the fraud they now allege in April 2010, at which point New York law imputed knowledge of the alleged fraud to them. *See Koch*, 699 F.3d at 155. Their fraud claim is thus untimely and must be dismissed.

## C.      **Defendants' Fraud Claim Duplicates Their Contract Claim**

Even were Defendants' fraud claim timely, it would still fail, because it duplicates Defendants' contract claim. "Under New York law, a breach of contract will not give rise to a tort claim unless a legal duty independent of the contract itself has been violated." *Bayerische Landesbank, N.Y. Branch* v.

*Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 58 (2d Cir. 2012). "Such a 'legal duty must spring from circumstances extraneous to, and not constituting elements of, the contract, although it may be connected with and dependent on the contract.'" *Id.* (quoting *Clark-Fitzpatrick* v. *Long Island R.R. Co.*, 70 N.Y.2d 382, 389 (1987)). But where a plaintiff pleads a tort claim in addition to a contract claim and the tort claim seeks the same benefit sought under the contract claim, the tort claim becomes duplicative of the contract claim and may not stand. *See id.* (citing *N.Y. Univ.* v. *Continental Ins. Co.*, 87 N.Y.2d 308, 316 (1995) ("[W]here a party is merely seeking to enforce its bargain, a tort claim will not lie." (internal citations omitted)).

Where, as here, a fraud claim is based on the "allegation that a party has made a contractual promise with no intention of performing it," it may be "sufficient to support an action for fraud, even where that statement relates to an agreement between the parties." *VTech Holdings Ltd.* v. *Lucent Techs., Inc.*, 172 F. Supp. 2d 435, 440 (S.D.N.Y. 2001) (quoting *Graubard Mollen Dannett & Horowitz* v. *Moskovitz*, 86 N.Y.2d 112, 122 (1995)). For such a claim to proceed, however, it must either "(i) demonstrate a legal duty separate from the duty to perform under the contract; ... (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996).

The fraud alleged here is premised on a theory that New York courts have expressly considered and dismissed as duplicative of contract claims. Defendants' claim here is analogous to one identified by the Second Department — that LiveIntent "promised to give [Defendants] an equity interest in the company and reneged on that promise." *Page* v. *Muze, Inc.*, 705 N.Y.S.2d 383, 384 (2d Dep't 2000). That same court rejected the claim, concluding that "[a] cause of action to recover damages for fraud may not be maintained when the only fraud alleged relates to a breach of contract." *Id.* Defendants' appropriate cause of action was one for breach of contract, which as discussed above, is untimely. They may not attempt to recover under an alternative theory of fraud based on the allegation that LiveIntent promised to perform under the modified contract but refused to do so. *See VTech Holdings Ltd.*, 172 F. Supp. 2d at 439 ("The rationale for this rule is that a party need not be expressing an unconditional intention to perform by contracting, and may instead be expressing an intention either to perform or suffer the ordinary contractual consequences for a breach.").

Hoping to avoid this result, Defendants contend that their fraud claim "is not merely that [LiveIntent] promised to pay and did not," but that LiveIntent "perpetuated [the fraud] in order to induce certain behavior on the part of Naples; namely, the continued extension of goodwill and the abstention from requesting his stock certificates." (Def. Opp. 10-11). The contention does not aid their cause. Instead, it confirms that Defendants do not premise their fraud claim on a theory that LiveIntent fraudulently induced them to enter into

the contract. Rather, the fraud claim, construed expansively, is that LiveIntent made a promise it never intended to keep, and thereafter lulled Naples into believing that LiveIntent was fulfilling its contractual obligations. *Cf. VTech Holdings Ltd.*, 172 F. Supp. 2d at 440-41 (upholding fraud claim based on allegations that plaintiff was induced to enter contract based on "series of misrepresentations of present fact, rather than a series of false promises"). Under New York law, these allegations cannot suffice to state a fraud claim.

In short, Defendants' fraud claim is not only untimely but also duplicative of its contract claim, and it fails for both of these independent reasons.

## D.      LiveIntent Is Entitled to Declaratory Judgment

Having dismissed Defendants' counterclaims, the Court proceeds to consider, and grant in part, LiveIntent's Rule 12(c) motion for judgment on the pleadings in the form of declaratory judgment. "The Declaratory Judgment Act provides that, '[i]n a case of actual controversy within its jurisdiction ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.'" *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 126 (2007) (alterations in original) (quoting 28 U.S.C. § 2201(a)). "[A] court may only enter a declaratory judgment in favor of a party who has a substantive claim of right to such relief." *In re Joint E. & S. Dist. Asbestos Litig.*, 14 F.3d 726, 731 (2d Cir. 1993). "[T]he indispensable prerequisites for declaratory relief are the existence of a live, definite and concrete controversy between

adverse parties and circumstances making a binding judicial declaration useful in establishing their rights." *Archie Comic Publications, Inc.* v. *DeCarlo*, No. 00 Civ. 5686 (LAK), 2001 WL 1543526, at *1 (S.D.N.Y. Dec. 3, 2001) (citing *E.R. Squibb & Sons, Inc.* v. *Lloyd's & Cos.*, 241 F.3d 154, 177 (2d Cir. 2001)).[7]

"Once a court concludes that declaratory relief is appropriate, the precise wording of the decree relates to the form rather than to the propriety of relief." *DeCarlo*, 2001 WL 1543526, at *1; *see also Hastings Dev., LLC* v. *Evanston Ins. Co.*, No. 14 Civ. 6203 (ADS) (AKT), 2016 WL 3632708, at *8 (E.D.N.Y. June 29, 2016) ("[I]t is entirely within the discretion of the district court to determine the scope and wording of a declaratory judgment.").

Though it grants the motion, the Court does not do so to the full extent sought by LiveIntent. In particular, the Court may not award LiveIntent declaratory relief on its request for a finding that the Letter of Agreement "is not an authentic, genuine, and enforceable document." (Compl. ¶ 25). To declare as such would be to delve into the facts of this case when, at this stage, the Court may only consider the pleadings and a limited set of relevant documents. In addition, the pleadings do not reveal whether the parties discussed or entered into any additional contracts aside from the alleged contract at issue. LiveIntent is thus not entitled to a judgment stating that

---

[7]     Defendants do not dispute that this case involves a substantial controversy between the parties and that the parties have adverse legal interests. (*See* Def. Opp. 12-13). *See also MedImmune, Inc.* v. *Genentech, Inc.*, 549 U.S. 118, 127 (2007) ("Basically, the question in each [declaratory judgment] case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." (quoting *Md. Cas. Co.* v. *Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941))).

"[t]he statute of limitations has expired on *any* claim that WIT Strategy or [Naples] could assert for compensation provided for services provided to LiveIntent," nor may the Court declare that "LiveIntent owes *no equity or other compensation* to WIT Strategy or [Naples]."  (*Id.* (emphases added)).

Instead, the Court grants Defendants' application for declaratory judgment as follows:

> The statute of limitations has expired on any claim for compensation that Defendants may have against LiveIntent arising out of the contract between these parties that was initially executed in March 2010 and allegedly modified in April 2010.  LiveIntent thus does not owe any equity or other compensation to Naples arising out of those transactions or occurrences.

## CONCLUSION

Given the foregoing, LiveIntent's motions to dismiss Defendants' counterclaims and for judgment on the pleadings are GRANTED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      February 23, 2018
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge